| DISTRICT COURT, BOULDER COUNTY COLORADO<br>1777 6th St., Boulder, CO 80302<br>303-441-3750 | DATE FILED: September 30, 2021 5:08 PM<br>FILING ID: C93678751E88E<br>CASE NUMBER: 2021CV30726 |
|---|---|
| Plaintiffs: **JOHN DOE, an individual, JANE DOE, an individual, and MARY DOE, an individual**<br><br>v.<br><br>Defendants: **DA'JON TYRIK JAMES, an individual, and THE ALEXANDER DAWSON SCHOOL, LLC, a Nevada Limited Liability Company** | Δ **COURT USE ONLY** Δ |
| *Attorneys for Plaintiffs*:<br>Aaron Belzer, Esq. #47826<br>JP Prentiss, Esq. #36691<br>Ashlee Hoffmann, Esq. #53818<br>Burnham Law<br>2760 29th Street, Suite #1E<br>Boulder, CO 80301<br>Telephone: (303) 990-5308<br>Fax Number: (303) 200-7330<br>E-Mail: aaron@burnhamlaw.com<br>jp@burnhamlaw.com<br>ashlee@burnhamlaw.com | Case Number:<br><br><br>Division: |
| **COMPLAINT AND JURY DEMAND** ||

COME NOW, John Doe, Jane Doe, and Mary Doe, by and through their undersigned counsel at Burnham Law, and submit their *Complaint and Jury Demand*, and state as follows:

## NATURE OF THE CASE

Defendants—an elite private school and a teacher employed by that school—are entrusted with the care, education, and safety of hundreds of minor students from kindergarteners to high schoolers.

Plaintiffs John and Mary Doe—along with other parents throughout the community—rely on Defendants to not only educate their children but also to keep them safe and healthy in the course of that education.  Likewise, students rely on Defendants to educate them and to keep them safe and healthy at school.  Defendants are paid a premium, in the form of annual tuitions, for doing so.  In fact, each student's family paid between $24,000 and almost $30,000[1] per year for the privilege of attending that ostensibly safe and healthy learning environment.

Here, however, the school failed to conduct due diligence in hiring its staff and instead hired a sexual predator who had just been accused of sexual misconduct at another elite private school.  What is more, the school failed to heed the concerns voiced by its own staff related to the teacher's clear grooming[2] behavior—concerns that were raised at the very beginning of the school year.

That teacher, Da'Jon Tyrik James, went on to sexually assault at least four of the school's students, including Mary Doe, who was a minor at the time.

In addition to the teacher's sexual assaults, the school's callous disregard for the safety and well-being of its students—which appears to fit a long-standing pattern of covering up and minimizing sexual assault on its campus and marginalizing the victims of those assaults—gives rise to the claims herein.

## PARTIES

1.  Plaintiff Mary Doe,[3] at all times relevant to this Complaint, was a resident and citizen of the State of Colorado, City of Boulder, County of Boulder.

---

[1] *Tuition, Costs, Tuition Assistance*, available at: https://www.dawsonschool.org/admission/tuition-costs-tuition-assistance

[2] "Grooming is a term used by a wide range of professionals working with sex offenders" and has been defined as "patterned behavior designed to increase opportunities for sexual assault, minimize victim resistance or withdrawal, and reduce disclosure or belief."  Jim Tanner & Stephen Brake, *Exploring Sex Offender Grooming*, available at http://www.stephenbrakeassociates.com/Exploring%20Sex%20Offender%20Groomin g.pdf

[3] Because Mary Doe was a victim of sexual assault and was a minor at the time that she was assaulted, this Complaint uses aliases for the Plaintiffs.  A motion requesting permission to use these aliases is filed contemporaneously with this Complaint.

2

Mary Doe ("Mary") was a minor and a student at The Alexander Dawson School when she was assaulted.

2.  Plaintiffs John Doe and Jane Doe, at all times relevant to this Complaint, were residents and citizens of the State of Colorado, City of Boulder, County of Boulder.  John Doe and Jane Doe are Mary Doe's parents.

3.  Defendant Da'Jon Tyrik James, at all times relevant to this Complaint, was a resident and citizen of the State of Colorado.  James resided in Boulder County, Colorado at the times of the assaults.  Upon information and belief, James currently is a resident of Denver County.

4.  Defendant The Alexander Dawson School, LLC, at all times relevant to this Complaint, was a Nevada Limited Liability Company, with its primary place of business located in the County of Boulder, in the State of Colorado.

## JURISDICTION AND VENUE

5.  This Court is vested with jurisdiction over the Defendants because the Defendants committed the tortious acts within the State of Colorado.  *See* § 13-1-124(1)(b), C.R.S.

6.  Venue is proper in Boulder County pursuant to C.R.C.P. 98(c)(1) because the Plaintiffs reside in the County of Boulder, State of Colorado, the assaults occurred in Boulder County, and because Defendant The Alexander Dawson School is physically located, and "may be found" in the County of Boulder, State of Colorado.

## FACTUAL ALLEGATIONS

7.  The Alexander Dawson School ("Dawson") is an elite private school that advertises itself as "Boulder County region's leading independent, college-preparatory school for students in grades K-12[.]"[4]

8.  Dawson espouses certain community commitments, stating that "[b]y embracing Dawson's community commitments, we will successfully cultivate

---

[4] *Dawson School*, available at: https://www.dawsonschool.org/

EXHIBIT 1, Page 3 of 30

a school culture most conducive to healthy student growth and development."[5]

9.    Those community commitments include, among other things, a commitment that Dawson staff will:

- Pursue excellence in our areas of responsibility.
- Seek to understand and meet the unique needs of every child entrusted to our care.
- Steward a physi[c]ally and emotionally safe environment conducive to student growth.
- Communicate proactively with families regarding student progress.
- Make decisions with students' best interests in mind.[6]

10.   For grades six through twelve, Dawson's 2020-21 tuition rates were $28,560, exclusive of the costs of books, transportation, and other experiential expenses.[7]

11.   Dawson is a member of the National Association of Independent Schools ("NAIS").

12.   NAIS has published recommendations related to educator sexual misconduct.

### Dawson Hires Accused Perpetrator of Sexual Misconduct, Da'Jon James, as Vocal Music Teacher

13.   In mid-2020, Da'Jon Tyrik James ("James") applied for a position at Dawson as its Vocal Music Teacher.

14.   Previously, in 2019 and 2020, James had been employed at the Cate School ("Cate") in Carpinteria, California.

---

[5] *Dawson School Community Commitments*, available at: www.dawsonschool.org/dawson-school-community-commitments

[6] *Dawson School Community Commitments*, available at: www.dawsonschool.org/dawson-school-community-commitments

[7] *At A Glance 2020-21 Tuition*, available at: https://www.dawsonschool.org/about-us/at-a-glance

4

15. However, in March of 2020—in the middle of the school year—James left Cate after working there for only approximately nine months.

16. Upon information and belief, James left Cate because he had been accused of sexual misconduct.

17. Thereafter, Cate informed any of James's inquiring prospective employers of James's departure and the reason for it.[8]

18. As applicable here, a number of other candidates also applied to Dawson for the Vocal Music Teacher position and were presented to the hiring committee.

19. Indeed, the committee selected certain candidates, in addition to James, to be interviewed.

20. However, Ann Carson (Dawson's Upper School Director at the time) hired James after interviewing him.

21. James was the first and only candidate interviewed for the Vocal Music Teacher position.

22. Dawson did not investigate why James abruptly left (or was terminated from) Cate after such a short stint of employment there.

23. Upon information and belief, Dawson did not contact administration or human resources at Cate regarding James before hiring him.

24. Alternatively, Dawson *did* contact Cate and learned of James's departure and the reasons for it but decided to hire James anyway.

25. By August of 2020, James was employed by Dawson and working in the position of Vocal Music Teacher.

---

[8] *See, e.g.*, Nick Masuda, *Former Cate School Teacher, Under Investigation for Sexual Misconduct Here, is Arrested in Colorado for Alleged Sexual Assault*, THE MONTECITO JOURNAL (Aug. 5, 2021), https://www.montecitojournal.net/2021/08/05/former-cate-school-teacher-under-investigation-for-sexual-misconduct-here-is-arrested-in-colorado-for-sexual-assault/

### *Dawson is Made Aware of Significant Concerns Regarding James's Grooming Behavior and His Alarming Admissions of Being Accused of Sexual Misconduct While at Cate*

26.   As part of his employment with Dawson, James was provided on-campus housing.

27.   In his position as Vocal Music Teacher, James was routinely required to be in the company of minor students with no other faculty or adults present.

28.   At all times relevant to the claims made herein, James was acting in the course and scope of his employment as the Vocal Music Teacher of Dawson.

29.   At a gathering of faculty and staff on Dawson's campus in August 2020, James asked other Dawson faculty members about the culture of sexual assault at Dawson and asked how Dawson handled sexual misconduct allegations.

30.   Moreover, James told the gathered Dawson employees that he had been accused of sexual misconduct with students while working at Cate.

31.   While making this admission, James laughed and joked about the issue.

32.   These statements, and James's flippant attitude towards serious allegations of sexual misconduct, were relayed to Ann Carson shortly after that gathering.

33.   Thus, in August of 2020, Dawson (through Ann Carson) was made aware that James had been accused of sexual misconduct while at Cate.

34.   At the same time, Ann Carson was also informed that James's conduct in making these statements was a typical way for a sexual predator to test his peers' reaction.

35.   Upon information and belief, Dawson took no action to investigate James's admissions at this time.

36.   Alternatively, Dawson investigated James's admissions and nevertheless proceeded to allow him to teach Dawson students.

37.   Nor did Dawson take any action to determine whether—in light of James's explicit admission that he had been accused of sexual misconduct—James

6

had been terminated from his previous employment due to allegations of sexual misconduct.

38.  Later that month, another Dawson employee reported to Ann Carson that James had held a gathering at his on-campus home with students.

39.  This employee expressed concern about James's behavior and credibly opined that it was obvious "grooming" behavior.

40.  Despite these reports, and the express concern of staff members, Dawson took no action to investigate James's history in general nor his termination from Cate specifically.

41.  Alternatively, Dawson investigated these concerns but nevertheless proceeded to allow him to teach Dawson students.

42.  Despite James's admissions, and the express concern of staff members, Dawson took no action to limit James's contact with its minor students or otherwise protect its students from James.

### *James Sexually Assaults Dawson's Students*

43.  From August 2020 through May 2021, Mary Doe was enrolled at Dawson.

44.  During the 2020-2021 school year, as well as for the previous year, Mary had been enrolled at Dawson.

45.  Mary's family paid tuition for Mary to attend Dawson.

46.  John and Jane Doe chose to send Mary to Dawson based on its educational curriculum and assurances that it would steward a physically and emotionally safe environment for Mary—as Dawson had represented it would.

47.  For the 2020-2021 school year, Dawson required payment of its annual tuition for Mary to attend Dawson.

48.  The Doe family paid this amount pursuant to the Enrollment Contract that John and Jane Doe entered into with Dawson, along with other attendant expenses for Mary to attend Dawson.

49.   In total, the family paid two years of tuition for Mary to attend Dawson, in addition to the other necessary expenses incurred for Mary to attend Dawson.

50.   As Dawson's Vocal Music Teacher, James was Mary's teacher and vocal coach and worked closely with her, giving her individual vocal lessons and specific coaching.

51.   James, as Dawson's Vocal Music Teacher, had been working for months to prepare Mary for her role in a Dawson school performance.

52.   James's instruction with Mary often took the form of individual coaching sessions with no other students or staff around.

53.   Indeed, at times, James would ask other students to leave the room so that he could work "one-on-one" with Mary.

54.   James also suggested Mary take private lessons with him, mostly outside of school hours.  James told Mary she was one of the best singers he had ever heard and that he would "make her a star."

55.   In late January 2021, Mary disclosed to her parents that for the previous several months, James had engaged in sexually inappropriate and aggressive behavior towards her and several other students.

56.   James abused his position of trust as a teacher, engaged in classic "grooming" behaviors with Mary and several other students, and sexually harassed and sexually assaulted Mary and several other students.

57.   For example, while employed as a teacher and in the course of the performance of his duties as Dawson's Vocal Music Teacher, James engaged in at least the following acts:

   a.   James showed Mary images of women in thongs, bikinis, and lingerie and asked her, "Do you think she's hot?"  James told Mary, "you wished you looked like them."  A friend of Mary's walked in while this happened and saw the images on James's phone.

   b.   James repeatedly told Mary she needed to "seduce the audience" and "have sex with the audience" and that she needed to convince him (meaning James) she was capable of that.

8

c.  James slapped Mary in the face repeatedly when she did not perform a song or monologue to his satisfaction.  This began as "playful" roughhousing but got more aggressive with time, escalating to obvious abuse.

d.  James placed his hand in between Mary's breasts, ostensibly "to assess her breathing."  Mary has been in vocal lessons since a young age and touching in this inappropriate way has never happened with any other instructor.

e.  James repeatedly hugged Mary closely, pushing his chest to hers and his penis against her.  Mary sensed that James's penis was erect on at least one occasion during this inappropriate contact.

f.  James repeatedly kissed Mary on the forehead and reassured her that kissing is okay with people you care for.

g.  James "roughhoused" with Mary by picking her up and swinging her around his body while touching her buttocks, legs, and thighs.

h.  James would comment to Mary about other Dawson students he thought were "hot," or "dressed like a slut," and he would rate female students' bodies, stating one of Mary's friends was an "11 out of 10." Upon information and belief, the student James claimed "dressed like a slut" was fourteen or fifteen years old at the time he made the comment.

i.  James would be very aggressive with direction during rehearsal, saying, "I'm going to give you a reason to cry."  This was done while other students were present.

j.  James would barter with Mary, giving private vocal lessons in exchange for her watching his dog at his home, sometimes outside of school hours and often

> during the evenings and weekends.  James told Mary that the Academic Dean's daughter walked his dog as well and told Jane Doe that he had permission from his Dawson supervisor to "barter" for the dog sitting and dog walking.
>
> k.   At one point, James told Mary, "I can't find my phone, can I call it from yours?"  At this time, having furtively obtained Mary's cell phone number, James began texting Mary.

58.   James expressed he was "in love" with a friend of Mary's and said he wanted to ask her out but was waiting for the right time.  He asked Mary's friend to meet him at his house at night on Wednesday, February 3, 2021—a day that faculty had off.

59.   Because Mary had grown increasingly uncomfortable with James's behaviors and felt responsible to stop her friend from meeting with James at his house at night, she reported some of James's behavior to her parents in late January 2021.

60.   Subsequently, Jane Doe sent an email to James stating that Mary would no longer be watching his dog or having private lessons with him.

61.   After receiving the email, James became unhinged and started speaking about Jane Doe around Dawson to students and others, including:

> a.   Stating to Mary, "Do you know about the email your mom sent me? She doesn't want me to fuck you."
>
> b.   Approaching a group of Mary's friends in the cafeteria saying, "Mary's mom thinks I want to fuck her."
>
> c.   Approaching other students who had a pre-existing relationship with Jane Doe, starting a conversation by asking, "What do you think of Mary's mom?"
>
> d.   James told Mary he was "terrified" of her mom.

62.   Shortly thereafter, John and Jane Doe brought these issues to Dawson's attention.

63.    On February 4, 2021, John and Jane Doe met with Dawson administrators Ann Carson, George Moore, and Christine Lipson to discuss the assaults suffered by Mary over the past several months at the hands of James.

64.    Dawson's administration indicated to the Does that they were shocked and considered it a very serious matter but nevertheless encouraged them to not discuss the incidents.

65.    The matter was allegedly addressed by Dawson in a conversation between James and George Moore, the Head of Dawson, after which James was permitted to resign.

66.    Dawson's administrators expressly promised that James would never again set foot on campus or have contact with the students.

67.    Rather than immediately reporting what was clearly a crime committed by a teacher against a student, Dawson's administration minimized James's egregious behavior and failed to protect Mary.

68.    As an example, on February 4th—after James had resigned—a member of Dawson's administration told one of the other victims (in front of Mary and other victims) that "[James] really cared about you, he just cared too much."

69.    On February 5th, the Does again spoke with George Moore in a follow-up phone call.  They asked if the assaults had been reported to the appropriate authorities.

70.    Mr. Moore, shockingly, and in violation of Dawson's own policies, declared that the behavior—indisputably sexual assault, sexual harassment, assault, and battery—was in a "grey area" regarding mandatory reporting, and he could not confirm if he or anyone at the school had reported the behavior.

71.    When questioned about this by the Does, Mr. Moore replied that he would need to speak to his attorney about what he could disclose, but that "[the Does] can always report it" themselves.

72.    Notwithstanding Mr. Moore's characterization of James's assault as being in a "grey area," Dawson's 2020-21 Upper School Handbook lists examples of sexual assault as including (but not being limited to) the "[u]nwanted kissing" and "[f]ondling or unwanted sexual touching of genitals, buttocks or breasts, under or over clothing."

11

73.   What is more, Dawson's 2020-21 Upper School Handbook also provides guidelines for appropriate adult-student relationships, including a list of actions adults should "never" engage in.

74.   James engaged in several of these actions, including but not limited to, making risqué jokes and sexually provocative or degrading comments; making inappropriate comments about students' appearances; touching students in inappropriate ways; using physical discipline; texting students; and flirting with students.

75.   Even so, Mr. Moore told the Does that there was nothing more he could do, things were out of his hands, and Dawson would not be pursuing the matter further because James had resigned and would not ever be returning to campus.

76.   John Doe, concerned about his family's safety, asked where James was currently residing (because he had formerly been living on campus).

77.   Mr. Moore replied simply that James was off campus, that Dawson had done its part, and further concerns were not Dawson's problem.

78.   On that same day, Mr. Moore sent what would be the Dawson administration's only communication to the Dawson community regarding the incident and surrounding circumstances. The message simply stated that James had resigned and "with respect to privacy we won't have additional details."

79.   Because of Dawson's failure to appropriately address the issue, Dawson faculty and staff continued to minimize James's sexual assault and marginalize James's victims, resulting in further trauma.

80.   For example, on February 6, 2021, Jay Parker, the head of Dawson's Middle School, sent an email to parents, students, and faculty expressing his sorrow over James's departure and offering to deliver letters of thanks from any students to James and encouraging students to have continuing contact with James.

81.   That same day a member of Dawson's administration sent an email to the school's acapella group's parents and inexplicably carbon copied Jane Doe, saying: "[a]s you know by now, music teacher Da'Jon James resigned this week. On behalf of Dawson, I apologize for the impact this has had on the Lost Keys. I also acknowledge that students may be experiencing a wide

12

range of emotions after hearing this news and want to let you know that, as always, upper school counselor Holly Smith is available to speak with students who need support."

82. At no point was Mary specifically offered any support by Dawson for the trauma she endured at James's hands.

83. Over the next weeks, Dawson continued to ignore the trauma inflicted by James.

84. Rather than offer support to Mary and the other victims, Dawson continued to downplay or simply ignore the reasons for James's departure.

85. For example, on February 15, 2021, Ann Carson—who had previously ignored explicit concerns that staff had expressed about James—sent another email to the acapella group (including one of the Does) apologizing for "the disruption that James (sic) recent departure has caused."

86. Although Dawson continued to apologize for James's departure, at no point did Dawson acknowledge the pain and trauma that James inflicted on Mary and other students.

87. Nor did Dawson take any steps to identify any additional victims or prevent future victimization of them or other students.

88. To be sure, Dawson's handling of James's departure led many students and members of the Dawson community to believe James had left Dawson because of something that had happened *to him*.

89. As a result of Dawson misleading the community, students spoke of how they had "lost their favorite teacher," and Mary was forced to endure these claims. Without having to out herself as the victim of sexual assault, she could not challenge these assertions.

90. What is more, because Dawson failed to give any information about James, members of the Dawson community continued to allow James to be in contact with their children.

91. On April 13, 2021, despite Dawson's earlier promise and the fact that James had sexually assaulted numerous students, Dawson invited James back on to campus during school hours.

13

92.   Students saw James arrive at campus and urgently contacted one of James's other victims, who in turn—and out of concern for Mary's safety—contacted Mary to warn her.

93.   Mary and other victims gathered in the school theater, fearing for their safety.

94.   That fear was reasonable and justified given that her reporting of James led to him losing his job, his income, and his place to live.

95.   Indeed, Mary—knowing how aggressive James was and terrified of his retaliation—believed she was going to be killed.

96.   She was reasonably concerned that James might seek revenge.  For the next thirty minutes, Mary frantically texted with her mother and father.

97.   Jane Doe called the school immediately upon learning of James's presence on campus, but no one to whom she spoke could explain why James was back on campus.

98.   Mary and the other students also called school security for help.

99.   The Dawson security guard callously told the students (who had been victimized by James) that he "didn't see what the big deal" was.

100.  James is now facing felony charges due to his actions in assaulting students while employed by Dawson.

101.  Furthermore, upon information and belief, James is also the subject of an investigation by the Santa Barbara County Sheriff's Office related to the allegations of sexual misconduct against him during his employment at Cate.

102.  On April 14th—more than two months after Dawson was made aware of James's sexual assaults on its students and after allowing James to terrify and re-victimize his victims by coming back on campus—Dawson, for the first and only time, reached out to Jane Doe to inquire about Mary's welfare.

103.  Perhaps coincidentally, that same day, Mary and other victims had gone to speak with Mr. Moore to express their concerns about James being on campus and the trauma that it had caused.

104.   Mary's impression was that Mr. Moore was wholly unreceptive and that speaking with Mr. Moore was "like talking to a wall."

105.   The next day the Does had a Zoom call with Mr. Moore and another administrator, Ann Hecox (the current Director of Dawson's Upper School), to address the fact that Dawson had permitted James to return to campus.

106.   Mr. Moore told the Does, incorrectly, that Mary had not been part of the group that came to speak with him on April 14th.

107.   The Does were stunned and hurt, particularly because Mary had spoken a great deal and relayed her personal trauma directly to Mr. Moore during that meeting.

108.   Mr. Moore's statement exemplified the utter disregard that Dawson had for the victims of James's sexual assault.

109.   Mary was deeply impacted, further traumatized, and demoralized by the meeting with Mr. Moore.

110.   When Jane Doe responded that Mary had been part of the group to speak with Mr. Moore, Mr. Moore's response was that Mary might have been part of the group, but he did not recognize her—despite her sharing her personal details of being victimized.

111.   On April 30th, another Dawson parent sent a letter to the Dawson community after learning of the sexual assault and the reasons for James's resignation.

112.   This letter indicated that the parent had requested the Dawson administration share more information with the community to keep children safe given that James was still offering private voice lessons to children.

113.   However, the letter further indicated that the Dawson administration had declined to take even this minimal step to ensure the safety and well-being of its students.

114.   At no point did Dawson inform the community, or even the majority of its faculty, of the reason for James's departure.

115. Instead, despite James's ongoing interactions with children in the Dawson community, Dawson repeatedly told faculty that the Dawson administration could not discuss the circumstances surrounding James's resignation.

116. Furthermore, faculty were instructed by Dawson not to talk to anyone about what had occurred regarding James's departure.  This led to James staying with a faculty member who was unaware of James's behavior and who had small children in the house.

117. After suffering both from James's sexual assault and Dawson's callous disregard for her trauma, Mary's academic performance suffered.

118. Mary experienced distractibility and attention issues following the assaults, and she became unable to focus and study for important exams.

119. Mary also had days where she dreaded going to school because of the trauma she endured, and her grades began to suffer.

120. Mary became paranoid while walking around the school, especially after James had been allowed back on campus despite Dawson's earlier promise that he would never be back on campus.

121. Indeed, Mary suffers the trauma and guilt often association with victimization, including but not limited to feeling ashamed, emotionally distraught, and easily triggered into states of extreme fear for her safety.

122. Mary's depression and anxiety were exacerbated and have affected her daily life.

123. For example, Mary has experienced episodes of panic while driving because of overwhelming anxiety that she feels upon seeing cars nearby that look like James's car.

124. Likewise, Mary feels unsafe while walking around school.

125. Moreover, the Doe family has avoided certain public places that were once a part of their regular lives out of fear that they would encounter James and thereby trigger Mary further, resulting in additional episodes of panic and depression.

126. Mary endured fits of crying, anxiety, nightmares, insomnia, and explicit memories, accompanied by phantom sensations of James's sexual assaults.

127. Dawson's action in allowing James to return to campus after his resignation only exacerbated Mary's trauma, and she has since experienced symptoms of post-traumatic stress disorder and feelings of being followed by him.

128. At time, Mary cries hysterically and is inconsolable.

129. Mary has sought therapy to address her trauma.

130. The other Doe family members have similarly suffered emotional distress, fear, and anxiety over these matters.

131. In fact, John and Jane Doe purchased surveillance cameras for their residence and personal alarms for both of their children.

132. Dawson's handling of this matter comports with its history of minimizing allegations of sexual misconduct on its campus.

133. Indeed, Dawson has a pattern and practice of covering up allegations of sexual misconduct by faculty and students.

134. Sexual misconduct is routinely not reported, and faculty members are often discouraged from reporting sexual misconduct despite their positions as mandatory reporters under Colorado law.

135. In fact, Dawson has disciplined faculty in the past for reporting sexual misconduct at Dawson.

136. Dawson has historically minimized and hidden allegations of sexual misconduct, allowing faculty to resign, or even finish out the year despite being accused of sexual misconduct.

137. Moreover, Dawson has a history of allowing students against whom allegations of assault have been made to remain at Dawson without being disciplined.

138. Indeed, upon information and belief and as further evidence of its pattern of minimizing sexual misconduct and marginalizing victims of sexual assault, Dawson maintains a "list" of students whom Dawson faculty are discouraged from reporting for sexual misconduct.

139. Just as it did with Mary, Dawson has historically prioritized protecting its reputation over the safety of its faculty and students.

140. Dawson repeated that historical practice in 2021 when it hired James despite him leaving Cate because of accusations of sexual misconduct, ignored repeated concerns about James's statements and behaviors reported by other faculty, minimized the assaults that Mary and the other victims subsequently suffered at James's hands, permitted James to resign rather than terminate him, allowed James back on campus after his resignation, and failed to appropriately address the trauma that James—and Dawson itself—had caused in this matter.

### FIRST CLAIM FOR RELIEF
### Assault
### Against James and Dawson (Respondeat Superior)

141. The Does incorporate all of the above allegations as though set forth herein in their entirety.

142. James was employed by Dawson.

143. James's duties specifically included teaching and coaching Dawson's students.

144. James's actions, described above, were only made possible because he was acting as a teacher and vocal coach to Mary.

145. James's actions were taken during the performance of his duties as an employee of Dawson and his actions were taken within the scope of those duties.

146. James intended to cause offensive physical contact with Mary when he— among other things—slapped her face, kissed her, pushed his erect penis against her body, and touched her breast area, buttocks, and thighs.

147. His actions placed Mary in apprehension of immediate physical contact, and indeed, his continued actions created a constant apprehension that he would touch her.

148. James's unwanted touching of Mary, sexual and otherwise, was extremely uncomfortable and offensive to her.

149.    As a direct and proximate cause of James's assault, the Does have suffered past and future non-economic damages including, but not limited to, physical and mental pain and suffering, inconvenience, emotional stress, fear, anxiety, embarrassment, humiliation, and impairment in the quality of life.

150.    As a direct and proximate cause of James's assault, the Does have suffered past and future economic losses including, but not limited to, therapy costs, security costs, loss of income, loss of ability to earn income in the future, and medical expenses.

## SECOND CLAIM FOR RELIEF
### Battery
### Against James and Dawson (Respondeat Superior)

151.    The Does incorporate all of the above allegations as though set forth herein in their entirety.

152.    James was employed by Dawson as a teacher and his duties specifically included teaching and coaching Dawson's students.

153.    James's actions were only made possible because he was acting as a teacher and vocal coach to Mary.

154.    James's actions were taken during the performance of his duties as an employee of Dawson, and within the scope of performing those duties.

155.    James caused offensive physical contact with Mary when he, among other things, slapped her face, kissed her, touched her breast area, buttocks, and thighs, and pushed his penis against her body.

156.    James intended to make this contact, as he acted with the specific purpose of causing contact with Mary's body.

157.    The unwanted sexual touching of Mary was offensive to her.

158.    As a direct and proximate cause of James's battery of Mary, the Does have suffered past and future non-economic damages including, but not limited to, physical and mental pain and suffering, inconvenience, emotional stress, fear, anxiety, embarrassment, humiliation, and impairment in the quality of life.

159.    As a direct and proximate cause of James's battery of Mary, the Does have suffered past and future economic losses including, but not limited to,

therapy costs, security costs, loss of income, loss of ability to earn income in the future, and medical expenses.

### THIRD CLAIM FOR RELIEF
### Invasion of Privacy by Intrusion
### Against James and Dawson (Respondeat Superior)

160.   The Does incorporate all of the above allegations as though set forth herein in their entirety.

161.   James was employed by Dawson as a teacher and his duties specifically included teaching and coaching Dawson's students.

162.   James's actions were only made possible because he was acting as a teacher and vocal coach to Mary.

163.   James's actions were taken during the performance of his duties as an employee of Dawson, and within the scope of performing those duties.

164.   James intentionally invaded Mary's privacy when he, among other things, slapped her face, kissed her, touched her breast area, buttocks, and thighs, and pushed his penis against her body.

165.   Such an invasion of Mary's privacy would be very offensive to a reasonable person.

166.   As a direct and proximate cause of James's invasion of Mary's privacy, the Does have suffered past and future non-economic damages including, but not limited to, physical and mental pain and suffering, inconvenience, emotional stress, fear, anxiety, embarrassment, humiliation, and impairment in the quality of life.

167.   As a direct and proximate cause of James's invasion of Mary's privacy, the Does have suffered past and future economic losses including, but not limited to, therapy costs, security costs, loss of income, loss of ability to earn income in the future, and medical expenses.

<u>Fourth Claim for Relief</u>
**Extreme and Outrageous Conduct**
**Against James and Dawson (Respondeat Superior) and Dawson Directly**

168. The Does incorporate all of the above allegations as though set forth herein in their entirety.

169. Defendant James was Mary's teacher and vocal coach.  As such he occupied a special position in relation to Mary and stood in loco parentis to Mary.

170. James was employed by Dawson as a teacher and his duties specifically included teaching and coaching Dawson's students.

171. James's actions were only made possible because he was acting as a teacher and vocal coach to Mary.

172. James's actions were taken during the performance of his duties as an employee of Dawson, and within the scope of performing those duties.

173. James exploited this special position to take advantage of Mary and to sexually harass and assault her by not only physically assaulting her by pushing his penis against her body, slapping her face, kissing her, touching her breast area, buttocks, and thighs but also by repeatedly making sexually inappropriate comments to her.

174. This conduct—that is, a teacher sexually assaulting and harassing his student and abusing his position of trust—is so outrageous that a reasonable member of the community would regard the conduct as atrocious, going beyond all possible bounds of decency, and utterly intolerable in a civilized community.

175. Additionally, Dawson occupied a special position in relation to Mary in that it was her school and stood in loco parentis to Mary.

176. However, Dawson hired James despite James previously leaving Cate based on accusations of sexual misconduct.

177. Dawson also continued to allow James to be in a position that enabled his assault of Mary, despite learning no later than August of 2020 that James had been accused of sexual misconduct at Cate and willfully ignoring the same.

21

178. Dawson continued to allow James to be in a position that enabled his assault of Mary, despite learning of concerns expressed by its faculty related to James's grooming behavior and willfully ignoring the same.

179. Dawson further allowed James back on to campus during school hours after he had been allowed to resign, despite Dawson's promise that he would not be on campus and despite James previously sexually assaulting its students.

180. And furthermore, Dawson, standing in a special relationship with Mary, failed to take any action to support or assist her in recovering from the assaults perpetrated by James.

181. Instead, Dawson minimized James's assaults and marginalized James's victims.

182. Indeed, Dawson's actions resulted in the community not knowing anything about James's actions and therefore continuing to allow James around children.

183. This conduct—that is, a school hiring a sexual predator despite being made aware of past allegations of sexual misconduct and ongoing grooming behavior, allowing that teacher back on campus to terrorize its students after promising the victims it would not, and supporting the accused teacher while marginalizing his victims—is so outrageous that a reasonable member of the community would regard the conduct as atrocious, going beyond all possible bounds of decency, and utterly intolerable in a civilized community

184. James's actions were taken with a reckless disregard as to the consequences his actions would have on Mary.  Indeed, his acts were intentional.

185. Dawson's actions were taken with a reckless disregard as to the consequences its actions would have on Mary.  Indeed, its acts were intentional.

186. James's and Dawson's actions and conduct caused severe emotional distress to Mary, which manifested as, among other things, nightmares, insomnia, stress, trauma, general decline in health and well-being, depression, anxiety, shame, grief, humiliation, embarrassment, anger, and panic attacks.

187. As a direct and proximate cause of James's and Dawson's extreme and outrageous conduct, Mary has suffered past and future non-economic damages including, but not limited to, physical and mental pain and

EXHIBIT 1, Page 22 of 30

suffering, inconvenience, emotional stress, fear, anxiety, embarrassment, humiliation, and impairment in the quality of life.

188.   As a direct and proximate cause of James's and Dawson's extreme and outrageous conduct, the Does have suffered past and future economic losses including, but not limited to, therapy costs, security costs, loss of income, loss of ability to earn income in the future, and medical expenses.

## FIFTH CLAIM FOR RELIEF
### Negligent Infliction of Emotional Distress
### Against James and Dawson (Respondeat Superior) and Against Dawson Directly

189.   The Does incorporate all of the above allegations as though set forth herein in their entirety.

190.   After learning that James sexually assaulted Mary Doe, Dawson promised the Does that James would not be allowed back on campus.

191.   James acted negligently when he returned to campus while his victims were present on campus.

192.   Dawson acted negligently when it allowed James back on to campus while Mary was present despite its earlier promise.

193.   Dawson's and James's negligence, given James's violent behavior, volatility, and previous assaults of Mary, created an unreasonable risk of physical harm to Mary.

194.   Dawson's and James's negligence caused Mary Doe to be placed in fear for her own safety.

195.   Indeed, Mary—knowing how aggressive James was and terrified of his retaliation—believed she was going to be killed.

196.   Mary was therefore in the zone of danger created by Dawson's and James's negligent conduct.

197.   Mary has suffered long continued emotional disturbance and distress.

198.   To be sure, she struggled for much of the rest of her academic year and continues to have anxiety and fear that James will seek her out.

EXHIBIT 1, Page 23 of 30

199. As a direct and proximate result of Dawson's and James's negligence, the Does suffered past and future non-economic damages including, but not limited to, physical and mental pain and suffering, inconvenience, emotional stress, fear, anxiety, embarrassment, humiliation, and impairment in the quality of life.

200. As a direct and proximate result of Dawson's and James's negligence, the Does have suffered past and future economic losses including, but not limited to, loss of income, therapy costs, security costs, loss of ability to earn income in the future, and medical expenses.

<u>SIXTH CLAIM FOR RELIEF</u>
**Negligent Hiring and Negligent Supervision**
**Against Dawson**

201. The Does incorporate all of the above allegations as though set forth herein in their entirety.

202. Upon information and belief, James was terminated (or permitted to resign) from his prior employment because of allegations of sexual misconduct.

203. Dawson failed to reasonably investigate the reasons behind James's departure from Cate.

204. Indeed, upon information and belief, Dawson did not contact Cate regarding James's employment and his reason for leaving Cate.

205. If Dawson had contacted Cate, it would have been made aware that James left Cate based upon allegations of sexual misconduct.

206. Alternatively, if Dawson did contact Cate, it disregarded information that James left Cate as a result of allegations of sexual misconduct.

207. Nevertheless, Dawson learned of the allegations in August of 2020, before James sexually assaulted and harassed Mary and the other students.

208. Dawson reasonably should have investigated this information by, at a minimum, contacting Cate.

209. Indeed, Dawson's failure to investigate James directly caused James to be able to utilize his position as a teacher to assault and harass Mary.

210. James's departure from Cate school based upon allegations of sexual misconduct gave (or should have given) Dawson reason to believe that, based upon his prior conduct, placing him as a teacher would create an undue risk of harm to the students placed in his care.

211. Despite this, Dawson continued to allow James to act as a teacher and to have access to children alone and unsupervised.

212. Indeed, James's actions while performing his duties as a teacher at Dawson did in fact cause harm to the students Dawson entrusted him with.

213. As a direct and proximate result of Dawson's negligence, Mary and her parents have suffered past and future non-economic damages including, but not limited to, physical and mental pain and suffering, inconvenience, emotional stress, fear, anxiety, embarrassment, humiliation, and impairment in the quality of life.

214. As a direct and proximate result of Dawson's negligence, the Does have suffered past and future economic losses including, but not limited to, therapy costs, security costs, loss of income, loss of ability to earn income in the future, and medical expenses.

### SEVENTH CLAIM FOR RELIEF
### Negligent Performance of Undertaking
### Against Dawson

215. The Does incorporate all of the above allegations as though set forth herein in their entirety.

216. Mary's parents entrusted Mary's health and safety to Dawson.

217. Mary's family paid tuition to Dawson for Mary to attend Dawson.

218. Dawson directly assumed the duty of providing care to and assuring Mary's safety.

219. In fact, Dawson's handbook explicitly prohibits almost all the acts that James inflicted upon Mary and the other victims.

220. Dawson's materials state that "students should be free to learn and socialize at Dawson in an environment free from sexual harassment and sexual assault."  Dawson therefore undertook to provide that environment.

221. Dawson's "community commitments" state that Dawson will "[s]teward a physi[c]ally and emotionally safe environment conducive to student growth." Dawson therefore undertook to provide that environment.

222. Mary's parents relied on Dawson to provide that environment for Mary.  They entrusted Dawson with Mary's health and safety, and specifically to provide their minor child with an environment free from sexual harassment and sexual assault.

223. Dawson negligently failed to provide that environment by placing James in a position to commit sexual assault and sexual harassment despite the fact that he had left Cate because of allegations of sexual misconduct.

224. Dawson negligently failed to provide that environment by continuing to allow James to be in a position of trust over children, despite learning, no later than August of 2020, that James had been accused of sexual misconduct at Cate and willfully ignoring the same, which increased the risk that that environment would not be provided.

225. What is more, Dawson negligently failed to provide that environment by continuing to allow James to be in a position of trust over children, despite learning of credible concerns that James's behavior constituted "grooming" behavior and willfully ignoring the same.

226. As a direct and proximate result of Dawson's negligence, the Does have suffered past and future economic losses including, but not limited to, therapy costs, security costs, loss of income, loss of ability to earn income in the future, and medical expenses.

227. As a direct and proximate result of Dawson's negligence, the Does have suffered past and future non-economic damages including, but not limited to, physical and mental pain and suffering, inconvenience, emotional stress, fear, anxiety, embarrassment, humiliation, and impairment in the quality of life.

<u>E</u>IGHTH <u>C</u>LAIM FOR <u>R</u>ELIEF
**Breach of Fiduciary Duty**
**Against James and Dawson (Respondeat Superior) and against Dawson**
**Directly**

228.   The Does incorporate all of the above allegations as though set forth herein in their entirety.

229.   James was employed by Dawson as a teacher and his duties specifically included teaching and coaching Dawson's students.

230.   James's actions were only made possible because he was acting as a teacher and vocal coach to Mary.

231.   James's actions were taken during the performance of his duties as an employee of Dawson, and within the scope of performing those duties.

232.   James, as Mary's teacher and individual coach, was in a position of superiority and influence and stood in loco parentis to her.

233.   As her teacher, James was bound to act for her benefit above his own in his interactions attendant to that relationship and was in a position of trust relative to her.

234.   James utilized his position of trust to sexually assault and harass Mary.

235.   For example, he touched Mary's breast area, and slapped her face, under the pretense of coaching her on her singing.

236.   Furthermore, he breached that trust by committing other acts such as kissing Mary, touching her buttocks and thighs, and pressing his penis against her.

237.   Dawson was likewise in a position of superiority and influence and stood in loco parentis to Mary.

238.   Dawson was bound to act for Mary's benefit above its own and was in a position of trust relative to her.

239.   Dawson failed to act reasonably in executing its fiduciary duty to Mary by hiring James despite James previously leaving Cate based on accusations of sexual misconduct.

EXHIBIT 1, Page 27 of 30

240.    Dawson failed to act reasonably in executing its fiduciary duty to Mary by continuing to allow James to be in a position of trust over Mary, despite learning no later than August of 2020 that James had been accused of sexual misconduct at Cate and willfully ignoring the same.

241.    Dawson failed to act reasonably in executing its fiduciary duty to Mary by continuing to allow James to be in a position of trust over Mary, despite learning of concerns expressed by its faculty related to James's grooming behavior and willfully ignoring the same.

242.    Dawson further breached its fiduciary duty by allowing James back on to campus during school hours after he had been allowed to resign, despite Dawson's promise that he would not be on campus and despite James previously sexually assaulting its students.

243.    And furthermore, Dawson, standing in a special relationship with Mary, failed to take any action to support or assist her in recovering from the assaults perpetrated by James.

244.    As a direct and proximate result of James's and Dawson's breach of their fiduciary duties, the Does suffered past and future non-economic damages including, but not limited to, physical and mental pain and suffering, inconvenience, emotional stress, fear, anxiety, embarrassment, humiliation, and impairment in the quality of life.

245.    As a direct and proximate result of James's and Dawson's breach of their fiduciary duties, the Does have suffered past and future economic losses including, but not limited to, therapy costs, security costs, attorney fees, costs, loss of income, loss of ability to earn income in the future, and medical expenses.

### NINTH CLAIM FOR RELIEF
### Breach of Contract Including
### Breach of Implied Covenant of Good Faith and Fair Dealing
### Against Dawson

246.    The Does incorporate all of the above allegations as though set forth herein in their entirety.

247.    Every Colorado contract contains an implied duty of good faith and fair dealing. *City of Golden v. Parker*, 138 P.3d 285, 292 (Colo. 2006).

248.   The Does entered into a contract with Dawson to enroll Mary Doe as a student at the school.

249.   The Does had a justified expectation that Dawson would take all reasonable steps to protect Mary as a student in Dawson's care.

250.   Indeed, Dawson promises as much in its various advertising materials, in its handbooks, and on its website.

251.   Due in part to these representations, the Does decided to enroll Mary as a student at Dawson.

252.   Dawson breached the contract by hiring James given the facts outlined above, failing to protect Mary from James's actions, actively failing to ensure that James was an individual in whose care Mary would be safe, and depriving Mary of the full benefits of being a student enrolled at Dawson—that is, safely and reasonably obtaining an education.

253.   Dawson breached the implied duty of good faith and fair dealing when it acted unreasonably, dishonestly, and outside accepted practices to deprive the Does of their reasonable expectations under the contract by failing to protect Mary from James's actions, actively failing to ensure that James was an individual in whose care Mary would be safe, and depriving Mary of the full benefits of being a student enrolled at Dawson—that is, safely and reasonably obtaining an education.

254.   As a direct and proximate result of Dawson's breach, the Does suffered past and future non-economic damages including, but not limited to, physical and mental pain and suffering, inconvenience, emotional stress, fear, anxiety, embarrassment, humiliation, and impairment in the quality of life.

255.   As a direct and proximate result of Dawson's breach, the Does have suffered past and future economic losses including, but not limited to, the value of the contract, loss of income, security costs, therapy costs, loss of ability to earn income in the future, and medical expenses.

### PLAINTIFFS DEMAND A JURY FOR ALL CLAIMS SO TRIABLE

Plaintiffs respectfully request a jury trial on all claims so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests this honorable Court enter judgment in their favor and against Defendants on all claims made herein, for damages in an amount to be determined at trial, costs and attorney fees, including fees under Section 13-17-102(4), C.R.S., if any claim or defense put forth by Defendants is substantially unjustified, along with costs and attorney fees where permitted, pre- and post-judgment interest, and for such further relief as this Court deems appropriate and just.

Plaintiffs also reserve the right to seek exemplary/punitive damages against Defendants after the exchange of initial disclosures pursuant to C.R.C.P. 26 and in accordance with Section 13-21-102, C.R.S.

Respectfully submitted this 30th day of September, 2021.

**BURNHAM LAW**
By:

*/s/ Aaron Belzer*
Aaron Belzer, Esq. #47826
JP Prentiss, Esq. #36691
Ashlee Hoffmann, Esq. #53818
Counsel for Plaintiffs

EXHIBIT 1, Page 30 of 30